# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### WESTERN DIVISION

**UNITED STATES OF AMERICA**

**VS.**                                    **CIVIL ACTION NO. 5:10-cv-50-DCB-MTP**
                                    **CRIMINAL ACTION NO. 5:06-cr-18-DCB-JCS**

**ROBERT C. ARLEDGE**                                              **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

This cause is before the Court on Petitioner's Motion to Vacate under 28 U.S.C. § 2255 [**docket entry no. 163**]. Having carefully considered the Motion, the Government's response thereto, and the affidavits filed by Robert B. McDuff, Esq., and Karl J. Koch, Esq., the Court finds that the Motion can be resolved on the 5000 pages of exhibits and therefore an evidentiary hearing is unnecessary. Schriro v. Landrigan, 550 U.S. 465, 475 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."); Perillo v. Johnson, 79 F.3d 441, 444 (5th Cir. 1996) ("'[C]ontentions that in the face of the record are wholly incredible' will not entitle one to discovery or a hearing" (quoting Blackledge v. Allison, 431 U.S. 63, 74 (1977)); see also 28 U.S.C. 2255(c), Rule 8 of te Rules Governing Section 2255 Proceedings. For the following reasons, the Petitioner's Motion will be denied with prejudice.

## I. Summary of the Arguments

The Petitioner alleges that he is entitled to relief pursuant

28 U.S.C. § 2255 because his sentence was imposed in violation of his rights guaranteed by the Fifth and Sixth Amendments to the United States Constitution. The Petitioner's seventy-seventy-page Motion and sprawling fifty-seven-page brief attempts to paint a dim picture of his counsels' representation, alleging that two of his attorneys, Rob McDuff and Karl Koch, (1) labored under a conflict of interest; (2) presented an objectively unreasonable defense; (3) made promises they did not deliver; and (4) restrained him from testifying.

The Court will address these issues in turn, responding only to those details that it deems relevant to their resolution. To the extent that the Petitioner advances a separate constitutional argument not specified as an issue presented, e.g., a Brady violation, that argument will be addressed in the manner it is raised, that is, as a component of the larger issue presented. If the Court does not respond to a specific factual allegation in the brief, the Court considers it to be one of the many details extraneous to the Petitioner's alleged grounds for relief.

## II. Analysis

### 1. There Is No Constitutional Violation Under Cuyler

*A. Cuyler v. Sullivan*

Typically, in order to prevail on an ineffective assistance of counsel claim, a defendant must show that "(1) his trial counsel was deficient and (2) the deficiency was prejudicial." United

States v. Painter, 243 F. App'x 818, 821 (2007) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). The Petitioner, however, advances his first Sixth Amendment argument under the Supreme Court's alternative framework established in Cuyler v. Sullivan, which requires a defendant to show that "an actual conflict of interest adversely affected his lawyer's performance." 446 U.S. 335, 350-51 (1980). The practical difference between the Cuyler framework and the Strickland framework is, simply, that under Cuyler a defendant need not show prejudice, i.e., a court need not opine as to how effective representation would have altered the outcome of the challenged proceeding. See Beets v. Scott, 65 F.3d 1258, 1265 (5th Cir. 1995) ("[T]he Cuyler test sets a lower threshold for reversal of a criminal conviction than does Strickland."). Under Cuyler, a court focuses on whether defense counsel's allegiance to one client adversely affected his representation of another. See id.

> *B. Koch did not have a conflict of interest under Cuyler v. Sullivan because in the Fifth Circuit Cuyler is applied only to conflicts of interest created by an attorney's representation of multiple clients*

It is not clear from the Petitioner's brief whether he is asking the Court to apply the Cuyler framework to Koch's representation, that is, if he suggests that prejudice be presumed from his conflict-of-interest allegations against Koch.[1] Fifth

---

[1] Throughout his brief, the Petitioner characterizes Koch as laboring under a conflict of interest, but he does not include

Circuit case law is clear, however, that the holding in <u>Cuyler</u> applies to claims involving an attorney's representation of multiple clients. <u>Beets</u>, 65 F.3d at 1272 (holding, after a thorough and well-reasoned analysis, that <u>Cuyler</u> applies only to instances of multiple representation). To state it another way, <u>Cuyler</u> does not apply to conflicts created because of an attorney's self-interest. <u>United States v. Newell</u>, 315 F.3d 510, 516 (5th Cir. 2002). To the extent that the Petitioner believes <u>Cuyler</u> applies to any alleged problems resulting from Koch's unauthorized withdrawal of funds or from his personal life, that notion is wrong.[2] Koch's lawyering will be addressed in the Court's <u>Strickland</u> analysis below. <u>United States v. Corona</u>, 108 F.3d 565, 575 (5th Cir. 1997) (finding that the defendant's conflict of interest claim was "in essence" one for ineffective assistance of counsel).

---

Koch's representation as a part of the first issue presented, which is devoted to McDuff's purported conflict of interest under <u>Cuyler</u>. <u>Compare</u> Pet.'s Brief at 25 ("Koch, impaired by an actual conflict of interest, failed to provide the Defendant with constitutionally sufficient representation." (citing <u>Cuyler</u>)), <u>with</u> <u>id.</u> at 1-12 (focusing on the relationship between McDuff and Shane Langston).

[2] The Petitioner cites <u>Reckmeyer v. United States</u>, 709 F. Supp. 680, 688-89 (E.D. Va. 1989), and <u>United States v. Magini</u>, 973 F.2d 261, 264 (4th Cir. 1992), for the proposition that <u>Cuyler</u> would apply to conflicts created by self-interest. <u>Magini</u> does appear to support that reading, and the Seventh Circuit has disagreed with the Fifth Circuit's limited application of <u>Cuyler</u>. <u>Spreitzer v. Peters</u>, 114 F.3d 1435, 1451 n.7 (7th Cir. 1997). Even if <u>Cuyler</u> did apply and the Petitioner could show that Koch had a conflict of interest, he would still have to demonstrate how Koch's lack of preparation altered the representation of his five-man trial team.

*C. Cuyler applies to the Petitioner's allegations against McDuff, but McDuff did not have a conflict of interest*

As for McDuff, the Petitioner devotes substantial attention in his brief to the alleged conflict of interest created by McDuff's prior representation of Shane Langston of the Langston, Frazer, Sweet and Freese Law Firm in connection with the government's investigation of the Fen-Phen fraud. Pet.'s Brief at 1-12, 17, 22, 26, 38, 43, 44, 53, 54. Specifically, the Petitioner alleges that McDuff possessed "dispositive and exculpatory evidence of the Defendant's innocence" but chose not to present this evidence because of his relationship with Langston. Id. at 7. The Petitioner does not offer direct evidence for this claim but reasons that McDuff's "irrational" choice not to present this "exculpatory evidence," which he believes could have harmed Langston in some way, can only be explained by McDuff's allegiance to Langston.

But, the facts do not support the Petitioner's arguments. In his declaration, McDuff states that his representation of Langston was terminated at least two years before he was hired by the Petitioner.[3] Not only that, but McDuff avers that he "never represented Shane Langston in connection with the government's investigation and [he] never told Arledge that [he] had." McDuff

---

[3] The Petitioner states multiple times that McDuff never offered him "objective proof" that his representation with Langston had been unambiguously terminated. The implication, it appears, is that McDuff's representation of Langston may not have been terminated. It is not clear to the Court what would constitute "objective proof."

5

Decl. at 2. Instead, McDuff states that he told the Petitioner of his former representation of Langston, and the Petitioner did not appear concerned with that information. Id. Indeed, the Petitioner did not discharge McDuff or ask him to withdraw. Id. at 3.

Moreover, the trial record supports the conclusion that McDuff's representation of Langston did not conflict with the Petitioner's interests. Contrary to the Petitioner's suggestion, the defense team *did* try to introduce evidence regarding Langston, Frazer, Sweet and Freese Law Firm's participation in the Fen-Phen litigation. United States v. Arledge, 553 F.3d 881, 894 (5th Cir. 2008). This attempt directly contradicts the Petitioner's theory that McDuff manipulated the presentation of evidence in an effort to avoid any inference that Langston may have been involved in the fraudulent Fen-Phen claims. And even if McDuff had wanted to minimize Langston's participation in the Fen-Phen litigation by avoiding the introduction of certain evidence, that point is moot because the evidence was not admissible.[4] The Court sustained the Government's objections to the introduction of evidence that the Langston, Frazer, Sweet and Freese Law Firm may have produced fraudulent claims, and the Fifth Circuit upheld that decision, finding "evidence that a similarly-situated attorney had pursued

_____

[4] Inasmuch as the Petitioner contends that Langston's involvement was relevant because Gallagher and other members of the cartel were the beneficiaries of the fraud for which he was convicted, this assertion has no foundation in the evidence. See Pet.'s Rebuttal at 18 and corresponding exhibits.

what turned out to be false claims has no bearing on whether Arledge had either actual knowledge of the fraud or was deliberately indifferent to the fraud." Id.[5] Whatever the extent of McDuff's representation of Langston, that representation could not have been materially adverse to the Petitioner's interests because "[t]hat another attorney may also have been engaged in fraud or been deliberately indifferent to fraud would not eliminate Arledge's liability." Id. Accordingly, the Petitioner's argument under Cuyler has no merit.[6]

Furthermore, in the context of a conflict-of-interest allegation, the Seventh Circuit has stated that "where a defendant is adequately represented by several lawyers and the defendant's overall representation is not impaired by any actual conflict, we will not reverse a defendant's conviction based upon ineffective assistance of counsel." Stoia v. United States, 109 F.3d 392, 399 (7th Cir. 1997) (citations omitted). The Court agrees that, even

---

[5] The Petitioner argues that the following "errors" can be attributed to McDuff's conflict of interest: (1) his refusal to introduce Albert Lewis, Eason Mitchell, or Will Colom as witnesses, Pet.'s Brief at 7, (2) his decision to "sit silent" during the cross-examination of Michael Gallagher, id. at 9, (3) his failure to call Louisa Dixon as a witness, id., (4) his choice not to cross-examine Bridgett Jackson regarding jury tampering. Id. at 10.

[6] Even if the Court should find that McDuff did have a conflict of interest, the Petitioner cannot show that the conflict of interest adversely affected his performance. The Petitioner calls McDuff's choices "irrational" and the unintroduced evidence "exculpatory," but, as explained below, neither the choices of the defense team or the unintroduced evidence warrants the application of those adjectives.

when a conflict of interest is alleged, whether that conflict adversely affected the defendant's overall representation should be the touchstone of the Court's inquiry. Application of this rule is another reason to repudiate the Petitioner's conflict-of-interest argument because the record does not support the inference that McDuff's alleged conflict of interest tainted the decisions of the trial team. See Turner v. Williams, 812 F. Supp. 1400, 1434 (E.D. Va. 1993) (stating that the petitioner was not prejudiced by one of his attorney's alleged conflicts because lead counsel provided conflict-free representation); cf. United States v. Tatum, 943 F.2d 370, 379 (4th Cir. 1991) (finding one counsel's conflict of interest tainted the representation of the other); Hoffman v. Leeke, 903 F.2d 280, 287 & n. 3 (4th Cir. 1990) (same); see also, United States v. Michaud, 925 F.2d 37, 41 n.2 (1st Cir. 1991).

## 2. There is No Constitutional Violation Under Strickland

*A. Strickland v. Washington*

Nor was his defense team's representation constitutionally deficient under Strickland.[7] The Petitioner's sometimes implicit, sometimes explicit effort to impute a combination of McDuff's and

---

[7] The Petitioner, invoking Bell v. Cone, 535 U.S. 685 (2002), goes so far as to suggest that prejudice may be presumed from Koch and McDuff's "fail[ure] to subject the prosecution's case to a meaningful adversarial testing." Pet.'s Brief at 15. Despite the Petitioner's attempt to portray the failure of his defense team as "complete," any fair reading of Bell indicates that the nature of his complaints are "plainly of the same ilk as other specific attorney errors subject to Strickland's performance and prejudice components." Bell, 535 U.S. at 697-98 (citations omitted).

Koch's supposed *conflicts of interest* to the alleged tactical errors of the entire defense team muddle his argument that he did not receive objectively reasonable representation. In a conflict-of-interest analysis, the conflicting loyalties of counsel are scrutinized, which necessarily involves parsing motives, but under Strickland, the objective reasonableness of counsel's actions and the possibility of prejudice are the primary objects of the Court's inquiry. Harrington v. Richter, 131 S. Ct. 770, 790 (2011) ("Strickland . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." (citation omitted)). Because Strickland calls for an objective analysis of counsel's trial performance, the Court need not respond directly to the intermittent references to McDuff's supposed conflict of interest or allegations regarding Koch's personal life—allegations that are woven throughout the Petitioner's complaints regarding the reasonableness of his defense team's trial tactics.[8] See Pet.'s Brief at 17, 22-26, 38, 43, 44.

In order for the Petitioner to convince the Court that

_____

[8] Under Strickland, it does not matter *why* Koch allegedly failed to present a reasonable defense. See Soering v. Deeds, 217 F.3d 840, at *5 (4th Cir. 2000) (unpublished table decision) (stating that the allegation that counsel was "emotionally and mentally troubled at the time of the trial" was properly rejected in the state court's Strickland analysis). Koch's admonition by the Louisiana Attorney Disciplinary Board for an event that occurred two years before the Petitioner's trial or any behind-the-scenes event occurring in his personal life is irrelevant to the Court's inquiry regarding whether he (or his trial team) made reasonable decisions at trial.

McDuff's and Koch's representation fell below an objective standard of reasonableness, he must overcome the presumption that his trial team's strategy was sound. <u>Strickland</u>, 466 U.S. at 689; <u>Ricalday v. Procunier</u>, 736 F.2d 203, 206 (5th Cir. 1984). This presumption means a court is "required not simply to give [the] attorneys the benefit of the doubt, . . . but to affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as they did." <u>Clark v. Thaler</u>, 673 F.3d 410, 421 (5th Cir. Mar. 5, 2012) (alterations in original) (internal quotation marks and citations omitted). Moreover, if the Petitioner can overcome this presumption, he must also show he was prejudiced by his team's implementation of its strategy, that is, "[there was] a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." <u>Strickland</u>, 466 U.S. at 695. Since much of the Petitioner's prejudice claim is based on his defense team's failure to present evidence, a showing of prejudice requires the Petitioner to do more than speculate as to what the evidence would have shown. <u>E.g.</u>, <u>Alexander v. McCotter</u>, 775 F.2d 595, 602 (5th Cir. 1985) ("[C]omplaints based upon uncalled witnesses were not favored because the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain, and that speculations as to what these witnesses would have testified is too uncertain.").

*B. The decision not to present a case in chief was objectively reasonable*

Before the Court gets too bogged down in the thirty-two pages of individual allegations, it highlights an important fact: the Petitioner had a five-member defense team at trial.[9] The Petitioner wants the Court to consider his allegations against McDuff, Koch, or a combination of the two, in isolation. For the Court to accept the Petitioner's premise, however, it must implicitly accept the proposition that Koch and McDuff used their powers of persuasion and preyed on the obsequiousness of their co-counsel to convince the defense team to—in the Petitioner's words—"refuse to present a defense." Pet.'s Brief at 5. This allegation is particularly dubious in light of the Petitioner's other refrain that the trial team "clearly" possessed "hundreds of pages of dispositve and exculpatory documents." Id. at 6. Given that the Petitioner was represented by five well-qualified attorneys at trial, the Court is immediately skeptical of the Petitioner claim that he received ineffective assistance of counsel. See Stoia, 109 F.3d at 399.

To be clear, the Court fully considered the affidavits of Michael Winfield, Esq., and William Kirksey, Esq., which the Petitioner claims undermine the Government's suggestion that he had the benefit of an exceptionally capable defense team. See Gov.'s Brief at 15-16, 20 (providing some background on each of the

---

[9] The Petitioner has six attorneys of record in his case, not counting Paul Winfield, who was one of his five attorneys at trial but, as the Petitioner put it, appeared solely in his capacity as a friend. See Pet.'s Rebuttal at 7.

Petitioner's attorneys). Winfield explicitly criticizes Koch and McDuff's decisions, and Kirksey limits his comments to Koch. Aff. of Winfield, Ex. 28, docket entry no. 166-6; Aff. of Kirksey, Ex. 29, docket entry no. 166-6. These affidavits, if anything, belie the Petitioner's attempt to pin the blame on Koch and McDuff because they demonstrate that the trial strategy, including whether the Petitioner would testify, was the product of team discussion. See Aff. of Winfield ¶ 7 ("Karl Koch and Robert McDuff refused to present a single witness in defense of Arledge *despite my adamant recommendations to the contrary* and the clear results of the focus group." (emphasis added)).

The obvious question raised by the affidavits is that if Winfield and Kirksey's position was clearly supported by the evidence, so much so that Winfield and Kirksey knew at the time that Koch or McDuff indisputably were making a strategic blunder, why did they not raise this issue at the time. Anticipating this question, the Petitioner answers that the evidence was too complicated for an attorney other than Koch, who had been with him during the early stages of the investigation, to enter the case at the eleventh hour and adequately comprehend the issues. See Pet.'s Rebuttal at 7. Not only does this theory corroborate, at least in part, Koch and McDuff's explanation as to why the evidence was not presented, see infra at 14, it is also not true that Koch was the only one familiar with it. Kirksey was the first attorney to appear

12

on the Petitioner's behalf, and Winfield and Kirksey, who were both on hand to try the case, aver that they knew the evidence.[10] <u>See</u> Aff. of Winfield ¶ 7; Aff. of Kirksey ¶ 5.[11]

Turning now to the particulars of the <u>Strickland</u> claim, the Petitioner argues that it was objectively unreasonable for the defense team not to present certain documents and not call certain witnesses that he believes would have shown that he sold his fee interest in Fen Phen I to Gallager before the submission of the fraudulent claims. <u>See, e.g.</u>, Pet.'s Brief at 30. Proving this fact, he explains, would demonstrate that he lacked a financial motive to submit the fraudulent claims. <u>Id.</u> Pitted against this view is Koch's explanation: the defense team made a conscious decision, with the Petitioner's approval, not to present some documents or testimony at trial because it determined that the value of this evidence was outweighed by the danger of confusing the jury. Aff. of Koch at 11-13, docket entry no. 179; <u>see also</u> Aff. of McDuff at 4, docket entry no. 175. Instead, the trial team

_____

[10] Interestingly, in his rebuttal brief, Petitioner gives a detailed, albeit unsubstantiated account of the discussions that occurred between Koch, Kirksey, and him. If true, these conversations are even more proof that the defense team was engaged with the Petitioner in ongoing discussions regarding the best defense. <u>See</u> Pet.'s Rebuttal at 6.

[11] The affidavits of Betty Arledge and Jeannette Ledbetter only increase the implausibility of the Petitioner's argument—if *everyone* knew that Koch was distracted and McDuff was making bad decisions, why did the reasoning of Winfield and Kirksey not prevail? <u>See</u> Aff. of Betty Arledge, Ex. 26, docket entry no. 166-6; Aff. of Jeannette Ledbetter, Ex. 27, docket entry no. 166-6.

chose to present a defense by attacking the government's case in chief through cross-examination. Aff. of McDuff at 4.

Unsatisfied with this choice, the Petitioner now identifies the unpresented "evidence." But the documents and testimony the Petitioner cites in support of his theory are just as inconclusive now as they were then. Despite the Petitioner's repeated assertions to the contrary, the evidence does not conclusively show that Gallager purchased his fee interest in Fen Phen I for $3,400,000 at a December 1999 meeting of the Fen-Phen "cartel." See Pet.'s Motion at 6.6, docket entry no. 163. Nor is there any conclusive evidence that he "did not make a single penny" from Fen Phen II. Pet.'s Brief at 31. Given the confusing and inconclusive nature of this evidence, the team's decision to attack the government's case in lieu of presenting this evidence was objectively reasonable. This Court cannot conclude that the there is a reasonable probability that the trial's outcome would have been different had the evidence been presented to the jury.

For example, the Petitioner claims that Koch did not use all the "objective documentary" impeachment evidence available to him to demonstrate during Gallagher's cross-examination that Gallagher was responsible for the submission of the fraudulent claims. Pet.'s Brief at 16-18. It is clear that proving that Gallagher was responsible for the fraudulent claims was Koch's main objective during cross-examination. In fact, Koch questioned Gallagher about

a number of documents—similar to those raised by the Petitioner—that were intended to show that it was Gallagher who was responsible for submitting the fraudulent claims. See Tr. Vol. 3 at 82-85, 106-09 (referring to documents, suggesting Gallagher was responsible for screening Fen-Phen claims), Ex. 17, docket entry no. 166-4. The unintroduced evidence to which the Petitioner refers does not prove, any more so than the evidence raised by Koch, that Gallagher was intentionally submitting fraudulent claims. Instead, that evidence, to the extent that it can be deciphered by the Court, is inconclusive.[12] Not attempting to impeach Gallagher with it at trial was not objectively unreasonable or prejudicial to the Petitioner.

Likewise, the Petitioner complains about McDuff's cross-examination of Regina Green or Christy Cox-Clay but cannot show that McDuff's approach was unreasonable or prejudicial. First, the

---

[12] The inconclusive nature of the evidence is even more complicated by the Petitioner's inaccurate representation of it. Compare Pet.'s Brief at 16 ("Exhibit 117.32, 43, 44, 47, which were produced by Gallagher to the Government pursuant to a Grand Jury Subpoena clearly show that Gallagher identified several fraudulent claims which he classified as Failed Proof Not Yet Flagged. He told no one about these claims and allowed the Special Master to pay them.") with *Potential* Failed Proof not yet FLAGGED, exs. 117.43-44, docket entry no. 166-24 (emphasis added) (providing a list of clients who may have submitted failed proof, mostly Swartz/Arledge clients); Medical Records, exs. 117.32, 117.47, docket entry no. 166-24 (showing proof that had been submitted by those clients and that Gallagher's office was double-checking that proof); Fen Phen II-1st Payout, Ex. 43.12, docket entry no. 166-12 (indicating that some claimants with potentially failed proof were paid, some were not).

Petitioner argues that McDuff should have done more to demonstrate that the phone conversation between Green and the Petitioner never occurred—a fact that has not been proved by the Petitioner.[13] The obvious reason McDuff did not ask the questions now suggested by the Petitioner is because he either knew or was concerned that the response would have harmed his client, whereas his line of questioning on this same issue based on Green's contradictory grand jury testimony was a reasonable approach at trial. See Tr. Vol. 4, at 161, 175, 177-82, Ex. 18, docket entry no. 166-5. As to the cross-examination of Cox-Clay, the Petitioner provides no context or explanation as to why it was unreasonable for McDuff not to question her about the Petitioner's investigation of the fraudulent Fen-Phen claims.[14] See also Arledge, 553 F.3d at 890.

As to the remaining Strickland arguments, no evidence indicates that an unidentified FBI agent taped conversations between Greg Warren and the Petitioner, but even if the Court assumed this conversation occurred, it cannot make a determination regarding prejudice because the contents of the conversation are wholly unknown. See Pet.'s Brief at 20-22. No reason existed for

---

[13] The Petitioner does not cite to any evidence in his brief that would indicate that the conversation did not occur.

[14] Additionally, just like his question of Green, McDuff's decision not to ask Cox-Clay about the investigation may have been intentional. The government has all along viewed the Petitioner's investigation of the fraud as a poorly-veiled cover-up attempt, and evidence exists to support that view. See Gov.'s Brief at 12-13.

the defense team to compel the testimony of Al Spiers—presuming his testimony was admissible—because the defense had Spiers's report available to them and was free to introduce its underlying evidence to support its conclusion at trial. Id. at 26-27; see generally Spiers Report, Ex. 49.6; docket entry no. 166-16.[15] Relatedly, the record does not indicate that "dozens of indispensable witnesses" stood ready to confirm the terms of the Fen Phen I settlement and his lack of involvement in the submission of the Fen-Phen claims. See Pet.'s Brief at 28-34. But the record does indicate that the defense team was aware of the potential testimony of these witnesses. Id. at 36; See Aff. of Winfield ¶ 5; see also Spiers Report, Ex. 49.6; Mayes Report (last three pages of the seventeen-page report omitted in the record), Ex. 12, docket entry no. 166-2. To the extent that the prosecutor's statements during opening argument were inaccurate, failing to object was neither irrational nor prejudicial because doing so would have magnified the significance of what were mostly debatable statements.[16] See Pet.'s

_____

[15] Kirksey personally mailed the report to the government well before the Petitioner's trial. See July 1, 2004 Letter, Ex. 49.6, docket entry no. 166-16. The report, which was written early in the government's investigation of the fraudulent Fen-Phen claims, concludes that Florine Wyatt was the mastermind behind the Fen-Phen fraud—a conclusion that is obviously wrong. This conclusion is understandable considering that some interviewees provided false statements to Spiers, most notably Greg Warren, who claimed he was uninvolved in the Fen-Phen fraud. See Spiers Report (Statement of Greg Warren), Ex. 49.6.

[16] The Court will not engage the Petitioner's argument on whether each statement by the prosecutor is correct. Reading the

Brief at 38-43; <u>United States v. Phillips</u>, 224 F.3d 765, at *3 (5th Cir. 2000) (unpublished table decision) (citing <u>Walker v. United States</u>, 433 F.2d 306, 307 (5th Cir. 1970)).[17] Finally, the Petitioner fails to specify which documents authenticated and produced to the Government pursuant to a grand jury subpoena would have aided his case if admitted at trial, and therefore the Court cannot determine whether it was unreasonable or prejudicial for the defense team not to introduce those documents into evidence. Pet.'s Brief at 43-44.

In sum, the majority of the Petitioner's argument, presented in the guise of a <u>Strickland</u> claim, is a post-hoc attempt to present to the Court what would have been his case in chief. Under

---

entire opening argument in context, the Petitioner stretches the prosecutor's statements to make them appear wrong. For instance, the prosecutor stated that Warren worked for and worked with the Petitioner. He clearly meant this not in the formal who-signed-the-paychecks sense but in the informal sense that the two conspired together with the Petitioner being "at the top." As for the suggestion that Arledge was a member of the cartel, the prosecutor did imply this fact, but Koch specifically took time to repudiate this suggestion in his opening argument. <u>See</u> Koch's Opening Argument, ex. 15B at 224, docket entry no. 166-3.

[17] The Petitioner drifts into a vague <u>Brady</u>/<u>Giglio</u> argument, capping it with the oft-quoted passage from <u>Berger v. United States</u>. 295 U.S. 78, 88 (1935) ("The United States Attorney is the representative not of an ordinary party to a controversy . . ."). The Court suspects from the backdoor presentation of this argument that the Petitioner knows that the facts do not support a <u>Brady</u> violation. Nevertheless, the government did nothing wrong by giving him a box of documents before trial that it believed were irrelevant to its case but he believes are exculpatory. The main point of his habeas petition is that this evidence was known to his defense team but was not presented to the jury.

Strickland, the job of the court is not to opine whether presenting that defense might have been more effective. See Richter, 131 S. Ct. at 790. Rather its job is to determine, without succumbing to the "distorting effects of hindsight," whether the choice made by the defense team not to present a case in chief was objectively unreasonable, and if so, was prejudicial to the Petitioner. Strickland, 466 U.S. at 689. Having carefully considered the Petitioner's many allegations, the Court finds that, even if the "evidence" raised by the Petitioner may have inured to his benefit at trial, the tactical decision of defense team not to produce this uncertain evidence, or its decision not to ask certain questions of the Government's witnesses, did not fall below an objective standard of reasonableness and therefore his Sixth Amendment claim under Strickland fails.

### 3. There is No Merit to the Petitioner's Remaining Arguments

> *A. The Petitioner is not entitled to habeas relief because Koch "made promises he did not deliver" in his opening argument*

Next, the Petitioner argues that he was denied effective assistance of counsel because Koch promised the jury that they would see evidence that was ultimately not produced at trial. The Defendant repeatedly cites two cases, United States v. Green, 365 U.S. 301 (1961) and Anderson v. Butler, 858 F.2d 16 (1st Cir. 1998) (panel decision), to support his contention that an attorney's broken promise to the jury can alone constitute a violation of the

Sixth Amendment. United States v. Green does not support this contention, or any other of the Petitioner's applications of the case's holding. See Green, 365 U.S. at 305; Pet.'s Brief at 46, 47, 49, 51. Although Anderson v. Butler does provide some basis for the Petitioner's arguments, the Court has no reason to believe that Koch's so-called broken promises should not be evaluated under a straightforward Strickland analysis, that is, whether the decision to include certain arguments in his opening and then not produce substantiating evidence was unreasonable or prejudicial. See Anderson, 858 F.2d at 19 (Breyer, J., dissenting) (suggesting that Strickland should apply).

As an initial matter, the promises that the Petitioner claims Koch broke are not the sort of "specific and dramatic" statements that would necessarily prejudice the Petitioner if they were in fact broken. United States v. Crawford, 680 F. Supp. 2d 1177, 1195-96 (E.D. Cal. 2009) (citing Anderson, 858 F.2d at 16, 17). But, inasmuch as Koch's opening argument, see Pet.'s Brier at 45-47, or other statements by members of his trial team at trial, id. at 47, implied that the Petitioner intended to put on a case in chief, the Court concludes, as explained above, the defense team did not commit error by abandoning this strategy in favor of presenting a defense through cross-examination. The fact is that the trial team did elicit testimony and did introduce documents in an attempt to substantiate Koch's theory of the case, see Exhibit List, docket

entry no. 91, but that theory was rejected by the jury. Because of the close correlation between Koch's opening and the evidence that was presented by the defense team, the Court finds that the Petitioner was not prejudiced by Koch's opening argument.

*B. The Petitioner was aware of his right to testify and chose not to exercise it*

The Petitioner concludes by suggesting that McDuff and Koch restrained him from testifying. According to one trial attendee, "Arledge asked repeatedly to testify on his own behalf but Koch and McDuff said no. Aff. of Ledbetter ¶ 16, Ex. 27, docket entry no. 166-6, <u>see also</u> Aff. of Betty Arledge ¶¶ 14, 15 (making a similar accusation), Ex. 26, docket entry no. 166-6 at 4. <u>But see</u>, Aff. of Winfield ¶ 10 (stating that he advocated for the Petitioner testifying); Aff. of McDuff at 5-6 (averring that the choice not to testify was the Petitioner's); Aff. of Koch at 8-10 (stating that the Petitioner and his wife "left no doubt in anyone's mind about his wishes: he did not want to testify, and he was relieved when I did not pressure him to change his mind."). While Winfield does state that he advocated for the Petitioner testify, not one of his attorneys unequivocally asserts, or even suggests, that the Petitioner was not responsible for his decision. The Court does not dispute that the decision was difficult—as it often is in criminal cases—but does find that it was a reasonable one that was deliberately made. Aff. of McDuff at 5-6.

### III. Conclusion

Having now addressed the issues presented in support of the Petitioner's § 2255 Motion, the Court recalls the testimony of the witnesses, together with the other evidence presented at trial, wherein the Petitioner was represented by competent and prepared counsel who presented an objectively reasonable defense. The jury was charged with the duty of deciding which witnesses to believe or not to believe and which other evidence the twelve would elect to accept as true or reject. There was inculpatory testimony given by Regina Green and Florine Wyatt, among others, that identified the Petitioner as one who participated in the matters set forth in the indictment, and obviously the jury ascribed validity to this testimony and found the Petitioner guilty. This verdict was not imposed in violation of the Constitution of the United States as the Petitioner suggests, and therefore the Court finds that there is no merit to his Motion to Vacate pursuant 28 U.S.C. § 2255.

**IT IS THEREFORE HEREBY ORDERED THAT** the Motion to Vacate under 28 U.S.C. § 2255 [**docket entry no. 163**] is **DENIED WITH PREJUDICE.** Furthermore, the Court finds that a reasonable jurist would not find its resolution of the Petitioner's constitutional claims debatable or wrong and therefore a certificate of appealability (COA) should not issue. 28 U.S.C. § 2253(c); <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000). **IT IS THEREFORE HEREBY ORDERED** that a COA with regard to any issues contained in the present order is **DENIED.**

So **ORDERED**, this the 6th day of December, 2012.

___/s/ David Bramlette_____
**UNITED STATES DISTRICT JUDGE**
